Scott T. Lashway (admitted *pro hac vice*)
*slashway@mintz.com*
Mara A. O'Malley (admitted *pro hac vice*)
*momalley@mintz.com*
Mitchell J. Clough (admitted *pro hac vice*)
*mjclough@mintz.com*
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
Telephone: 617.542.6000
Facsimile: 617.542.2241

Marc H. Axelbaum (SBN: 209855)
*maxelbaum@mintz.com*
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
44 Montgomery Street, 36th Floor
San Francisco, California 94104
Telephone: 415.432.6000
Facsimile: 415.432.6001

*Attorneys for Defendant*
*PubMatic, Inc.*

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIRSTIE SEMIEN, MICHAEL SELBY, GILBERT GAW, LOGAN MITCHELL, and JANE DOE, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PUBMATIC, INC.,<br><br>Defendant. | Case No. 3:25-cv-03164-SI<br><br>**PUBMATIC, INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT**<br><br>Date: October 10, 2025<br>Time: 10:00 a.m.<br>Courtroom: 11<br>Judge: Hon. Susan Illston<br><br>Complaint filed: April 8, 2025<br>Trial date: not yet set |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 10, 2025, at 10:00 a.m., before the Honorable Susan Illston, United States District Judge, in Courtroom 11 at the United States District Court, Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, Defendant PubMatic, Inc. will and hereby does move this Court for an order dismissing, without leave to amend, and/or striking certain allegations from the Class Action Complaint filed by Plaintiffs Kirstie Semien, Michael Selby, Gilbert Gaw, Logan Mitchell, and Jane Doe, individually and on behalf of all other persons similarly situated under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). This Motion is made on the grounds that (1) Plaintiffs lack standing to bring their claims; and (2) Plaintiffs fail to allege sufficient facts to state any claim upon which relief may be granted. This Motion is based upon this Notice of Motion, the accompanying Memorandum of Supporting Points and Authorities, the concurrently filed Request for Judicial Notice, the Declaration of Scott T. Lashway and exhibits thereto, all pleadings and papers in this action, and such evidence and argument as may be presented at the hearing on this Motion.

## ISSUES TO BE DECIDED

1. Whether Plaintiffs' claims should be dismissed because they fail to allege an injury in fact to establish Article III standing to pursue their claims.

2. Whether Plaintiffs' claim for intrusion upon seclusion (Count I) should be dismissed because Plaintiffs fail to allege adequately (a) a reasonable expectation of privacy or (b) an egregious breach of the social norms underlying the privacy right.

3. Whether Plaintiffs' claim under Section 631(a) of the California Invasion of Privacy Act (CIPA) (Count II) should be dismissed because Plaintiffs fail to allege that (a) their communications were intercepted in transit, (b) the contents of their communications were intercepted, and (c) PubMatic aided and abetted any third-party violation of Section 631(a).

4. Whether Plaintiffs' claim under Section 2511 of the Electronic Communications Protection Act (ECPA) (Count V) should be dismissed because (a) they fail to allege that their communications were intercepted in transit, (b) they fail to allege the contents of their communications were intercepted, and (c) website and application developers consented to any

alleged interception.

5. Whether Plaintiffs' claim under Section 638.51 of CIPA (Count III) should be dismissed because PubMatic's technologies do not constitute a pen register within the meaning of the statute.

6. Whether Plaintiffs' claim for unjust enrichment (Count IV) should be dismissed because Plaintiffs (a) fail to allege any fraud and (b) chose to sue in tort.

Dated: August 15, 2025

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.

By: */s/ Scott T. Lashway*
Scott T. Lashway
(admitted *pro hac vice*)
Marc H. Axelbaum
Mara A. O'Malley
(admitted *pro hac vice*)
Mitchell J. Clough
(admitted *pro hac vice*)

*Attorneys for Defendant PubMatic, Inc.*

# TABLE OF CONTENTS


**Page**

INTRODUCTION ........ 1

BACKGROUND ........ 1

A. PubMatic's products and services as alleged. ........ 1

B. Plaintiffs' alleged experiences and claims........ 4

LEGAL STANDARDS........ 6

A. Rule 12(b)(1) ........ 6

B. Rule 12(b)(6) ........ 6

ARGUMENT ........ 6

I. Plaintiffs Lack Article III Standing Because They Do Not Allege They Suffered An Injury In Fact. ........ 6

A. Web browsing data collection does not create an injury in fact. ........ 7

B. PubMatic does not collect, share, or transfer information identifying Plaintiffs........ 8

II. Plaintiffs' Complaint Fails to State a Claim. ........ 10

A. Plaintiffs' intrusion upon seclusion claim (Count I) fails because the collection of web-browsing data is routine, lawful commercial behavior, not an egregious breach of any reasonable expectation of privacy. ........ 12

1. The internet is not a private place. ........ 12

2. The collection of browsing data to craft targeted advertisements is not a highly intrusive invasion of privacy. ........ 15

B. Plaintiffs fail to plead any wiretapping under CIPA § 631(a) or the ECPA (Counts II and V). ........ 16

1. Plaintiffs' conclusory allegations do not adequately allege any interception "in transit." ........ 16

2. Plaintiffs do not plead that PubMatic intercepted a "communication." ........ 18

3. Plaintiffs fail to plead adequately aiding-and-abetting liability under CIPA. ........ 20

4. The website operators' consent also defeats Plaintiffs' ECPA claim. ........ 21

C. Plaintiffs' claim under CIPA § 638.51 (Count III) fails because the PubMatic Tracker is not a "pen register." ........ 23

D. Plaintiffs' duplicative unjust enrichment claim (Count IV) should be dismissed. ........ 25

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Community.com, Inc.*,
2021 WL 4805435 (C.D. Cal. Aug. 2, 2021) ... 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 6

*Aviles v. Liveramp, Inc.*,
2025 WL 487196 (L.A. Cty. Super. Jan. 28, 2025) ... 24

*B.K. v. Desert Care Network*,
2024 WL 5338587 (C.D. Cal. Aug. 22, 2024) ... 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 6

*Cobbler Nev., LLC v. Gonzales*,
901 F.3d 1142 (9th Cir. 2018) ... 9

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) ... 21

*DZ Rsrv. v. Meta Platforms, Inc.*,
96 F.4th 1223 (9th Cir. 2024) ... 7

*Farst v. Autozone, Inc.*,
700 F. Supp. 3d 222 (M.D. Pa. 2023) ... 13

*Fraser v. Nationwide Mut. Ins. Co.*,
352 F.3d 107 (3d Cir. 2003) ... 18

*Folgelstrom v. Lamps Plus, Inc.*,
195 Cal. App. 4th 986 (2001) ... 15

*Graham v. Noom, Inc.*,
533 F. Supp. 3d 823 (N.D. Cal. 2021) ... 18

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024) ... 12, 14

*Harris v. KM Indus., Inc.*,
980 F.3d 694 (9th Cir. 2020) ... 6

*Hill v. Nat'l Collegiate Athletic Assn.*,
7 Cal. 4th 1 (1994) ... 12, 15

*Hubbard v. Google LLC*,
2024 WL 3302066 (N.D. Cal. July 1, 2024) ... 12, 15

*I.C. v. Zynga, Inc.*,
600 F. Supp. 3d 1034 (N.D. Cal. 2022) ... 7

*In re Google, Inc. Priv. Pol'y Litig.*,
58 F. Supp. 3d 968 (N.D. Cal. 2014) .......... 15

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) .......... 16

*In re Jenson*,
24 Cal. App. 5th (2018) .......... 25

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) .......... 11

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) .......... 17, 18, 20

*Ji v. Naver Corp.*,
2022 WL 4624898 (N.D. Cal. Sep. 30, 2022) .......... 13

*Jones v. Peloton Interactive, Inc.*,
720 F. Supp. 3d 940 (S.D. Cal. 2024) .......... 15

*King v. Hard Rock Cafe Int'l (USA), Inc.*,
2025 WL 1635419 (E.D. Cal. June 9, 2025) .......... 19, 20

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) .......... 15, 21, 22

*Libman v. Apple, Inc.*,
2024 WL 4314791 (N.D. Cal. Sept. 26, 2024) .......... 15

*Lightoller v. JetBlue Airways Corp.*,
2023 WL 3963823 (S.D. Cal. June 12, 2023) .......... 7, 8

*London v. New Albertson's, Inc.*,
2008 WL 4492642 (S.D. Cal. Sep. 30, 2008) .......... 13

*Low v. LinkedIn Corp.*,
2011 WL 5509848 (N.D. Cal. Nov. 11, 2011) .......... 10

*Low v. LinkedIn Corp.*,
900 F. Supp. 2d 1010 (N.D. Cal. 2012) .......... 12, 13, 15, 16

*Massie v. General Motors LLC*,
2022 WL 534468 (D. Del. Feb. 17, 2022) .......... 14

*McCoy v. Alphabet, Inc.*,
2021 WL 405816 (N.D. Cal. Feb. 2, 2021) .......... 16

*Mikulsky v. Noom, Inc.*,
682 F. Supp. 3d 855 (S.D. Cal. 2023) .......... 7, 8

*Mikulsky v. Noom, Inc.*,
2024 WL 251171 (S.D. Cal. Jan. 22, 2024) .......... 8, 9

*NovelPoster v. Javitch Canfield Grp.*,
140 F. Supp. 3d 938 (N.D. Cal. 2014) ........ 18

*Pels v. Keurig Dr. Pepper, Inc.*,
2019 WL 5813422 (N.D. Cal. Nov. 7, 2019)........ 6

*People v. Mitchell*,
46 Cal. App. 5th 919 (2020)........ 23, 24

*Rodriguez v. Google LLC*,
2022 WL 214552 (N.D. Cal. Jan. 25, 2022) ........ 17

*Roe v. Amgen Inc.*,
2024 WL 2873482 (C.D. Cal. June 5, 2024) ........ 22

*Rosenow v. Facebook, Inc.*,
2020 WL 1984062 (S.D. Cal. Apr. 27, 2020) ........ 17

*Saeedy v. Microsoft Corp.*,
2023 WL 8828852 (W.D. Wash. Dec. 21, 2023)........ 7, 10, 13

*Sanchez v. Cars.com*,
2025 WL 487194 (L.A. Cty. Super. Jan. 27, 2025) ........ 24

*Sepehry-Fard v. MB Fin. Servs.*,
2015 WL 903364 (N.D. Cal. Mar. 2, 2015)........ 25

*Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC*,
733 F.3d 1251 (9th Cir. 2013)........ 6

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021)........ 25

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ........ 13, 14

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)........ 6, 7, 13

*Sussman v. ABC*,
186 F.3d 1200 (9th Cir. 1999)........ 22

*Thomas v. Papa Johns Int'l, Inc.*,
2024 WL 2060140 (S.D. Cal. May 8, 2024)........ 12, 13

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 7

*Warren v. Fox Fam. Worldwide*,
328 F.3d 1136 (9th Cir. 2003)........ 6

*Yale v. Clicktale, Inc.*,
2021 WL 1428400 (N.D. Cal. Apr. 15, 2021) ........ 19

**Statutes and Rules**


18 U.S.C.
§ 2511(1) .......... 16, 17
§ 2511(2) .......... 21, 22

Cal. Civ. Code
§ 1798.99.82 .......... 25
§ 1798.99.87 .......... 25
§ 1798.100. .......... 25
§ 1798.120 .......... 25
§ 1798.135 .......... 25

Cal. Penal Code
§ 631(a) .......... *passim*
§ 638.50 .......... 23, 24
§ 638.51 .......... *passim*
§ 638.52 .......... 23

Federal Rule of Civil Procedure
12(b)(1) .......... 6
12(b)(6) .......... 6


**Legislative Materials**


AB 929 Analysis, Assembly Committee on Privacy & Consumer Protection (Cal. Apr. 21, 2015) .......... 24

AB 929 Analysis, Senate Committee on Public Safety (Cal. June 4, 2015) .......... 24

SB 690 Analysis, Senate Committee on Public Safety, 2025-2026 Reg. Sess. (Cal. Mar. 24, 2025) .......... 11

Sen. Bill No. 690, 2025-2026 Reg. Sess. (Cal. May 29, 2025) .......... 11

## INTRODUCTION

The theories Plaintiffs advance in their Complaint reflect an illogical reading of California (and federal) law that would have vast consequences for how the internet functions. In short, Plaintiffs allege that the routine collection of anonymized internet browsing data is, although authorized by one chapter of California law, prohibited by another. By Plaintiffs' telling, every website -- because it must record users' IP addresses to function as directed by the user -- violates California criminal law and exposes a website operator to immeasurable civil liability. But that type of activity is not what the California Invasion of Privacy Act ("CIPA") was designed to prohibit, as California's Senate recently confirmed. Nor does it give rise to a cognizable injury sufficient to establish Plaintiffs' standing to sue in this Court. Plaintiffs' flawed understanding of the law infects each of their claims.

Unfortunately for Plaintiffs, their claims fail for several independent reasons as well. They have no reasonable expectation of privacy in their anonymous web browsing data and so cannot state a common-law invasion of privacy claim. Their Complaint contains nothing more than conclusory allegations that "contents" of their communications were intercepted "in transit" under CIPA and the Wiretap Act. And they misread CIPA Section 638.51 to stretch the definition of "pen register" beyond the meaning of the statute. Accordingly, Plaintiffs' Complaint should be dismissed in its entirety with prejudice.

## BACKGROUND

### A. PubMatic's products and services as alleged.

PubMatic is a scaled digital advertising platform, working with website and application publishers to help target digital advertisements. (Compl. ¶¶ 49, 113, 144, ECF No. 1.) Plaintiffs allege that PubMatic is a data broker, registered with the State of California. (*Id.* ¶¶ 15, 22, 48.) And while Plaintiffs assert that "data brokers like Defendant" "compile" information about users' activity "across the Internet," use this data to create profiles "about users," and then sell those profiles to advertisers so that they can target their advertisements, (*id.* ¶¶ 22, 24), Plaintiffs do not allege that PubMatic violated any statute specifically regulating data brokers.

Instead, Plaintiffs' Complaint includes paragraph after paragraph of irrelevant allegations

and broad generalizations. Plaintiffs identify a litany of activities in which data brokers allegedly engage, like "ID Bridging" and collecting zip codes, (*see id.* ¶¶ 29, 105–11), but do not allege that ***PubMatic*** does any such thing. Plaintiffs go to great lengths to describe several of PubMatic's products and services, (*e.g.*, *id.* ¶¶ 124–26), only one of which is relevant to Plaintiffs' claims. And Plaintiffs identify numerous categories of information that PubMatic allegedly collects and shares with its partners, (*see id.* ¶ 126), many of which are not the categories of information Plaintiffs allege were collected about ***them***. This rhetoric obscures the fundamental concepts on which Plaintiffs' claims are premised: PubMatic's pixel, which they pejoratively dub the "PubMatic Tracker,"[1] and the limited, anonymous information it allegedly collected about them.

***How the pixel works.*** Plaintiffs allege that the PubMatic Tracker is installed by website and app publishers -- not by PubMatic -- on their respective websites or apps. (*See id.* ¶ 45.) After a user "reache[s]" those websites, (*id.* ¶ 152), the PubMatic Tracker then allegedly loads and places a cookie on the user's browser, (*id.* ¶ 71). That cookie allegedly "links a proprietary ID number to the cookie," which then is used along with device metadata to "uniquely identify each browser or device from which an individual user" visits websites that have chosen to install the PubMatic Tracker. (*Id.* ¶¶ 71–72.) Plaintiffs do not allege, however, that PubMatic reveals the individual person associated with that "proprietary ID" to any other person. Nor do Plaintiffs allege that PubMatic itself can even associate the "proprietary ID" with any individual person.

***What the pixel allegedly collects.*** Once the pixel loads, Plaintiffs allege that the PubMatic Tracker collects certain pieces of data, such as users' browser and device information, URLs of websites users visit, and IP addresses, which allow PubMatic to "track and identify Website users across the internet." (*Id.* ¶ 74.) Plaintiffs also allege that the PubMatic Tracker collects "advertising identifiers" like "AAIDs (for Android devices) and IDFAs (for iOS devices)." (*Id.* ¶ 98.) Allegedly, PubMatic "cross-reference[s]" this information with other unidentified information into a "profile" on the user. (*Id.* ¶ 76.) What Plaintiffs do not -- and cannot -- plausibly allege is that PubMatic uses this information to match that user profile to a specific person.[2]

---

[1] PubMatic uses Plaintiffs' terminology for the Court's convenience in this motion but disputes Plaintiffs' characterization that the pixel is a "tracker."

[2] While Plaintiffs conclude that PubMatic's user profiles consist of both online and offline

Plaintiffs do not allege that the "advertising identifiers" disclose the identity of a specific individual, and indeed concede that the device IDs are "supposed to be anonymous." (*Id.* ¶ 105.) Further, while Plaintiffs claim that IP addresses can be used "to personally identify individuals," (*see id.* ¶ 83), they do not allege that PubMatic does so or how a company might do so. Indeed, they acknowledge that targeting users based on an IP address is -- by their own alleged metric -- only 95% accurate and is used instead to "determine the approximate physical location of a device." (*Id.* ¶¶ 82–83, 85–86.)

***How the pixel uses anonymous data.*** Plaintiffs allege that PubMatic uses anonymous information collected through its pixel to provide various services to its customers and partners. (*See id.* ¶ 126.) Even assuming Plaintiffs' characterizations are accurate, Plaintiffs fail to allege that any of the activities in which Plaintiffs allege PubMatic engages involve de-anonymizing data or identifying specific individual persons, like Plaintiffs.

Begin with PubMatic's "Identity Resolution" product, "Identity Hub." Plaintiffs allege that it allows advertisers to "simplify and combine user ID information" by permitting cookies to share information about "individual internet users" -- not individual, identifiable people -- with other cookies. (*Id.* ¶¶ 112–13 (alleging that "Identity Hub" allows clients "to standardize, if not deanonymize, user information"), 120.) Yet Plaintiffs do not allege that any website or company used PubMatic's Identity Resolution service to actually attempt to deanonymize their data. (*See id.* ¶¶ 212 (ECF p. 52)[3], 223, 234, 246, 257 (alleging at most that other pixels "could" somehow deanonymize the data).)

Plaintiffs also allege that PubMatic and other entities engage in a process called "cookie syncing." Cookie syncing allegedly allows different companies to recognize a user bearing one cookie's proprietary ID (*e.g.*, UserABC) as the same user bearing their own proprietary ID (User123). (*See id.* ¶¶ 38–39, 40.) Plaintiffs claim that cookie syncing "prevents users from being anonymous when they visit websites," (*see id.* ¶ 43), but they do not allege that PubMatic discloses specific users' identities through cookie syncing, or that cookie syncing allows PubMatic to

---

data collected on individuals, (*see* Compl. ¶ 281(b) and (c)), nowhere do they allege where, when, or how PubMatic collects "offline" data.

[3] The Complaint has two sets of paragraphs numbered 209–17. (*See id.* at ECF p. 50–52.)

determine users' actual identities. In other words, while cookie syncing may permit a tracker to recognize that "UserABC" and "User123" are the same user, Plaintiffs do not allege that ***anyone*** (PubMatic or other parties) recognizes that the user is, for example, Plaintiff Semien.

**B. Plaintiffs' alleged experiences and claims.**

Plaintiffs allege that they each visited a website that either installed the PubMatic Tracker or installed other trackers from which PubMatic also receives data. Although relying on generalized allegations of how the PubMatic Tracker (and other pixels) work, Plaintiffs' alleged experiences reveal that each website employs the PubMatic Tracker in different ways.

***Semien.*** Semien alleges that the PubMatic Tracker loaded when she visited Buzzfeed. (*Id.* ¶¶ 209–10 (ECF p. 52).) She alleges that PubMatic "collected information" about her, including her IP address, information about her device and browser, and webpages she visited on Buzzfeed and other unnamed websites. (*See id.* ¶¶ 4, 212 (ECF p. 52).) She then alleges that PubMatic shared her IP address, unique ID attached to PubMatic's cookies, unspecified "previously collected information," and unspecific "information about which pages of the Buzzfeed website she visited." (*Id.* ¶ 213 (ECF p. 52).) Although she alleges that PubMatic collects URLs from Buzzfeed, she does not allege what URLs she visited, or what they reveal about those webpages. (*See id.* ¶ 172.)

***Gaw.*** Gaw alleges that the PubMatic Tracker loaded when he visited Peacock's website. (*Id.* ¶¶ 219–220.) Like Semien, Gaw claims that PubMatic "collected information" about him, including his IP address, information about his device and browser, and webpages he visited on Peacock and other unnamed websites. (*See id.* ¶¶ 5, 222.) But Plaintiffs' analysis of Peacock's website does not allege that the PubMatic Tracker collects IP addresses from visitors to Peacock. (*See id.* ¶¶ 160–66.) Nor does it claim that any URLs -- much less detailed, full-string URLs -- are collected. (*See id.*)

***Doe.*** Doe alleges that a pixel (not PubMatic's) loaded when she visited Mindbloom's website, which provides information about and prescriptions for ketamine therapy. (*Id.* ¶¶ 193, 252–53.) She alleges that this pixel then communicated with a second pixel, which eventually communicated with the PubMatic Tracker. (*Id.* ¶ 254.) Doe's allegations mimic Semien's and Gaw's: that the PubMatic Tracker collected information about her, including her IP address,

information about her device and browser, and webpages she visited on Mindbloom and other unspecified websites. (*Id.* ¶¶ 8, 256, 258.) But, again, Doe's analysis of the Mindbloom website reveals no allegations that most of this information was in fact collected. There is no allegation that users' IP addresses are collected on Mindbloom. (*See id.* ¶¶ 193–204.) And Plaintiffs allege only that the general domain name (*i.e.*, *mindbloom.com*) is collected, not any specific URL or pages visited on that website. (*See id.* ¶ 196.) Doe as well as Semien and Gaw allege no factual detail about what "other websites" they visited and what information was collected or shared on those websites. (*See id.* ¶¶ 4, 5, 8.)

***Selby.*** Selby alleges that the PubMatic Tracker loaded when he visited Zillow. (*See id.* ¶¶ 229–30.) He alleges that PubMatic "collected information about [his] device, browser," and the webpages he visited on Zillow, and "receiv[ed] the full-string URL of each page of the website," which revealed "the specific properties [he] clicked on and viewed." (*Id.* ¶¶ 231–32.) Selby does not allege that PubMatic collected his IP address or any other identifiers. (*See id.* ¶¶ 229–40.) Nor do Plaintiffs allege that the PubMatic Tracker is configured to collect that information from users on Zillow's website. (*See id.* ¶¶ 150–59.) Finally, Selby alleges that PubMatic "tracked his future web browsing activity across the internet" and "assisted" other pixels in this alleged "wiretapping [of] his communications with websites," (*id.* ¶ 237), although he does not identify what specifically those communications were.

***Mitchell.*** Mitchell alleges that the PubMatic Tracker loaded when she visited Bon Appetit. (*See id.* ¶¶ 241–42.) Like Selby, she alleges that PubMatic "collected information about [her] device, browser," and the webpages she visited on Bon Appetit, and "receiv[ed] the full-string URL of each page of the website." (*Id.* ¶¶ 243–44.) Unlike Selby, Mitchell does not allege how those full-string URLs reveal anything about the specific webpages she visited. (*See id.* ¶¶ 244–45.) Mitchell does not allege that PubMatic collected her IP address or any other identifiers, or that the PubMatic Tracker is configured on Bon Appetit to do so. (*See id.* ¶¶ 182–92, 241–51.) And while she alleges the PubMatic Tracker "wiretapp[ed]" her communications, she does not allege what alleged communications were intercepted on unspecified websites. (*See id.* ¶ 248.)

Relying on these alleged "interceptions" of their browsing data, Plaintiffs bring five claims:

(I) common-law intrusion upon seclusion; (II) wiretapping under CIPA § 631(a); (III) installation of a pen register under CIPA § 638.51(a); (IV) unjust enrichment; and (V) wiretapping under the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510 *et seq.*

## LEGAL STANDARDS

### A. Rule 12(b)(1)

A Rule 12(b)(1) motion tests the Court's subject-matter jurisdiction over the claims. Jurisdictional challenges can be facial or factual. *See Pels v. Keurig Dr. Pepper, Inc.*, 2019 WL 5813422, at *1 (N.D. Cal. Nov. 7, 2019). A facial attack, like here, asserts that the allegations contained in a complaint are "insufficient on their face to invoke federal jurisdiction." *Harris v. KM Indus., Inc.*, 980 F.3d 694, 699 (9th Cir. 2020). The Court uses the same lens as a Rule 12(b)(6) motion, accepting all non-conclusory, factual allegations as true and construing them in the light most favorable to Plaintiffs. *Warren v. Fox Fam. Worldwide*, 328 F.3d 1136, 1139 (9th Cir. 2003).

### B. Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims stated in the complaint. To survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Factual allegations must raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court accepts all well-pled, material factual allegations as true. *Pels*, 2019 WL 5813422, at *2. But a court may disregard "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (citation omitted).

## ARGUMENT

### I. Plaintiffs Lack Article III Standing Because They Do Not Allege They Suffered An Injury In Fact.

Plaintiffs bear the burden of demonstrating their Article III standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016). Standing requires that Plaintiffs have suffered an injury in fact: "an invasion of a legally protected interest" that is "concrete and particularized" and "actual

or imminent, not conjectural or hypothetical." *Id.* at 338–39 (cleaned up).[4] An injury in fact "must actually exist." *Id.* at 340. Typically, violation of a statute (like CIPA or the ECPA) does not itself constitute an injury in fact. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425–26 (2021). Accordingly, the harm alleged must bear a "close relationship" to a harm "traditionally" recognized as providing a basis for a lawsuit in American courts. *Id.* at 424. Plaintiffs must have standing for each of their claims and for "each form of relief sought," *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1240 (9th Cir. 2024), based on injuries they personally suffered, *Spokeo*, 578 U.S. at 338 n.6.

Plaintiffs assert five claims here; each premised on the invasion of a privacy interest. To plead that injury here, plaintiffs must "identify the 'specific personal information [they] disclosed that implicates a protectable privacy interest,'" *Mikulsky v. Noom, Inc.* (*Mikulsky I*), 682 F. Supp. 3d 855, 864 (S.D. Cal. 2023) (citation omitted), because the information at issue must be "of a nature that disclosure or intrusion thereupon would be highly offensive to the reasonable person" to bear the "close relationship" to a traditionally recognized harm, *see I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1049 (N.D. Cal. 2022). This, Plaintiffs cannot do.

Plaintiffs' allegations do not establish an injury in fact for two reasons: (1) general web browsing data collection does not intrude upon a protectable privacy interest; and (2) the collection and use of anonymous data, unaffiliated with any specific individual, cannot cause injury.

**A. Web browsing data collection does not create an injury in fact.**

Plaintiffs claim they were injured by the "dissemination and/or misuse of their sensitive, confidential communications and information," and their alleged inability to "conduct[] personal activities without observation, intrusion or interference" on the internet. (*See* Compl. ¶ 277.) But mere surveillance of web browsing, without more, does not establish an injury in fact. *See, e.g.*, *Lightoller v. JetBlue Airways Corp.*, 2023 WL 3963823, at *4 (S.D. Cal. June 12, 2023) (no Article III injury from collection of plaintiff's browsing flight information on website because "[f]light pricing information is not personal information"); *Saeedy v. Microsoft Corp.*, 2023 WL 8828852, at *5 (W.D. Wash. Dec. 21, 2023) (collection of "users' internet browsing activities, internet

[4] The injury must also be fairly traceable to the defendant's conduct, and "likely to be redressed by a favorable judicial decision." *Id.* at 338.

searches, . . . online shopping behavior, . . . keyword search terms, URLs, and unique user identifiers and cookies" not sufficient (citation omitted)). Only if Plaintiffs' "highly sensitive information" is collected could they potentially establish an injury in fact. *See Lightoller*, 2023 WL 3963823, at *4 n.3. Plaintiffs Semien, Gaw, Selby, and Mitchell do not even attempt to allege facts showing that the information collected is "sensitive." *See Mikulsky I*, 682 F. Supp. 3d at 864 (Article III standing not adequately alleged without allegations of what specific "personal information" the plaintiff disclosed on the internet). Nor could they, because there is generally nothing "sensitive" about, for example, home shopping, recipes, or news articles. Only Doe attempts to allege the collection of sensitive information, but even that fails because, as set forth below, Doe's conclusory statements that PubMatic somehow "deanonymize[d]" her data, (*see* Compl. ¶¶ 257, 261, 262), are insufficient to establish that PubMatic collected information specific to Jane Doe, rather than to an unidentifiable ID.

**B. PubMatic does not collect, share, or transfer information identifying Plaintiffs.**

Plaintiffs also fail to allege a cognizable privacy interest because the data PubMatic collects is anonymous. And the disclosure of anonymized data does not constitute an injury in fact under Article III. *See, e.g.*, *Mikulsky v. Noom, Inc.* (*Mikulsky II*), 2024 WL 251171, at *4 (S.D. Cal. Jan. 22, 2024) (dismissing CIPA claim for lack of standing because there is no "protectible privacy interest" in "non-individually identifiable data").

Plaintiffs deploy numerous conclusory phrases attempting to demonstrate that PubMatic can and does identify, or helps identify, each Plaintiff personally. For example, Plaintiffs claim that PubMatic:

- engages in "cookie syncing," which allows one cookie to match its anonymized, alphanumeric user IDs to that used by another cookie, (Compl. ¶¶ 38–40);
- provides software that allows its clients to "to simplify and combine user ID information" from "multiple platforms," (*id.* ¶¶ 112–13);
- collects "various forms of PII and web activity records" that "on [their] own, [are] enough to identify the individual internet ***user***," (*see id.* ¶¶ 205–06 (emphasis added));
- "receives user information such as demographic data, geolocation information, user identifiers, personal information and ID syncing data from its partners," (*see id.* ¶ 208);

- can somehow use IP addresses to identify a specific individual (although Plaintiffs do not allege that PubMatic actually does this), (*see id.* ¶ 83); and
- uses IDs attached to Android devices -- which they admit are "supposed to be anonymous" -- that when "combined with" inferences and other unspecified tools, "sufficiently permit[] an ordinary person to identify a specific individual," (again, though, Plaintiffs do not allege that PubMatic actually does this), (*id.* ¶¶ 102, 105).

Based on these allegations, Plaintiffs conclude that PubMatic "de-anonymize[s] users" to match those users to specific individuals. (*See id.* ¶ 45; *see also id.* ¶ 113.)

But that conclusion is not supported by factual allegations. Rather, Plaintiffs' allegations that certain data can identify specific individuals are not only conclusory but flout common sense. Take IP addresses. Plaintiffs claim they can be used to identify specific individuals. But the Ninth Circuit has found that allegation implausible in another context (copyright infringement). *Cobbler Nev., LLC v. Gonzales*, 901 F.3d 1142, 1145 (9th Cir. 2018). Because "multiple devices and individuals may be able to connect via an IP address," the Ninth Circuit requires more than just an IP address "to create a reasonable inference that a subscriber is also an infringer." *Id.* Even Plaintiffs admit that the techniques are not perfectly accurate. (*See* Compl. ¶¶ 86, 90.) Nor do Plaintiffs explain in any factual detail how device IDs, which they tellingly concede are "anonymous," can somehow be used to "identify a specific individual." (*See id.* ¶¶ 102, 105.) Plaintiffs' conclusory (and implausible) allegations cannot adequately establish their standing.

Nor can Plaintiffs base their standing on alleged activities that they do not allege occurred here. *See Mikulsky II*, 2024 WL 251171, at *5 (allegations of software's capacity generally to potentially de-anonymize data not relevant to plaintiff's standing because the allegations "do not pertain to Defendant or even purport to allege that these capabilities were executed by Defendant" as to plaintiff). Yet their Complaint is rife with generalized allegations of what is theoretically possible. (*See, e.g.*, Compl. ¶¶ 82–90 (alleging practice of "IP targeting," which allegedly allows the identification of specific individuals, but failing to allege that happened here); *id.* ¶¶ 105–111 (alleging ID bridging can be used to de-anonymize user IDs, but failing to allege that occurred here).) Those allegations about what pixels ***could theoretically do***, even if factually supported (which they are not), are irrelevant without allegations that those activities actually occurred here.

Instead, all Plaintiffs actually allege is that PubMatic collects information that links data to

a specific user profile. (*See, e.g.*, *id.* ¶¶ 38–40 (cookie syncing tracking "a user"); *id.* ¶ 74 (PubMatic's cookies, IP addresses, and device identifier information allow PubMatic to "identify Website users"); *id.* ¶ 112 (identity resolution allegedly allows clients to "identify the users"); *id.* ¶ 206 (data collected are "enough to identify the individual internet user").) But identifying a "user" is not the same as identifying a person. Plaintiffs must instead allege how "third party advertisers would be able to infer [their] personal identity from [these] anonymous user ID[s] combined with [their] browsing history." *See Low v. LinkedIn Corp.* (*Low I*), 2011 WL 5509848, at *3 (N.D. Cal. Nov. 11, 2011) (no standing based on similar allegations related to LinkedIn ID). Even if someone with the ID "User123" can be associated with certain browsing history and related information, those data are still anonymous without plausible allegations that PubMatic discloses that User123 is a specific person. (*See* Compl. ¶¶ 39–40.) The same fault dooms Plaintiffs' reliance on "cookie syncing" or identity resolution, too, because allowing trackers to match their profile for "User123" with what they know to be "UserABC," (*see id.* ¶¶ 39, 112), still does not adequately allege that those processes link those anonymous IDs ***to a specific individual***.

Plaintiffs thus fail to allege adequately -- as they must -- that the data PubMatic allegedly collects and/or shares (even assuming Plaintiffs' supposition about the data is true) can be linked to a specific ***person***. *See Low I*, 2011 WL 5509848, at *3 (no standing based on collection and disclosure of browsing data tied to an anonymous LinkedIn ID); *see also Saeedy*, 2023 WL 8828852, at *4 ("anonymized data" insufficient to support standing).

In short, because Plaintiffs have no reasonable expectation of privacy on the internet, and because Plaintiffs fail to adequately allege how the anonymized data here are actually de-anonymized to identify specific people, they fail to allege a concrete Article III injury.

**II. Plaintiffs' Complaint Fails to State a Claim.**

Even if they had standing, each of Plaintiffs' claims fails for several independent reasons. First, Plaintiffs have no reasonable expectation of privacy on the internet, and the anonymized information allegedly collected is not sensitive, thus defeating Plaintiffs' intrusion upon seclusion claim. Second, Plaintiffs' CIPA and ECPA claims, including their claim that PubMatic aided and abetted wiretapping, fail because PubMatic does not operate a cookie that intercepts the contents

of communications while in transit and further, the websites allegedly operating PubMatic's cookie consent to its deployment. Third, Plaintiffs' claim that PubMatic violated CIPA Section 638.51 also fails because PubMatic does not operate a "pen register" within the meaning of the statute. And, finally, Plaintiffs' unjust enrichment claim fails because they allege no fraud and cannot seek restitution here where they have sued in tort.

More broadly, Plaintiffs' claims are premised on an attempt to create a violation of an alleged privacy right that simply is not cognizable. "[M]ost of us understand that what we do on the Internet is not completely private." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 266 (3d Cir. 2016). Internet users routinely share data with third parties through a variety of services, feeding a system of "trackers, cookies, and algorithms designed to capture and monetize the information we generate." *Id*. That is how the internet remains free; without advertising revenue, there is no incentive for websites to publish content to the masses. Recognizing that truism, the California Senate recently rejected the very theory that Plaintiffs propagate here: that routine commercial behavior essential to the internet's functioning is prohibited by California and federal law. The California Senate amended provisions of CIPA to shut down claims like Plaintiffs' precisely because (as the Bill's sponsor put it), CIPA was "never intended to apply" to "website analytics or online advertising," which "are already governed by the . . . [California Consumer Privacy Act ('CCPA')]." (Lashway Decl., Ex. C, SB 690 Analysis, Sen. Comm. on Pub. Safety, 2025-2026 Reg. Sess. (Cal. Mar. 24, 2025).) That is why the California Senate unanimously passed amendments to CIPA, clarifying that it does not apply to routine, commercial services like those at issue here. (*See id.*, Ex. D, Sen. Bill No. 690, 2025-2026 Reg. Sess. (Cal. May 29, 2025) (as amended) (CIPA's private right of action "does not apply to the processing of personal information for a commercial business purpose").) Nevertheless, Plaintiffs insist that the very activities the California Senate excluded from CIPA's purview are unlawful, opening up nearly every website operator not only to exponential civil liability, but also criminal liability under CIPA and the ECPA. As the California Senate recognized, applying the law in that way would destroy the internet. Plaintiffs' Complaint should be dismissed with prejudice.

### A. Plaintiffs' intrusion upon seclusion claim (Count I) fails because the collection of web-browsing data is routine, lawful commercial behavior, not an egregious breach of any reasonable expectation of privacy.

Plaintiffs allege that PubMatic breached their privacy rights by collecting data about their web-browsing activity. (Compl. ¶¶ 277–79.) A common-law claim for invasion of privacy requires "(1) intrusion into a private place, conversation or matter (2) in a manner highly offensive to a reasonable person." *Low v. LinkedIn Corp.* (*Low II*), 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012).[5] Plaintiffs fail to clear the "high bar" that California law sets for either element of their claim. *Id.*

#### 1. The internet is not a private place.

When evaluating a purported reasonable expectation of privacy, the question in the context of electronic data is whether "a user would reasonably expect that [the defendant] would have access to the user's individual data." *Hammerling*, 2024 WL 937247, at *3. "If the undisputed material facts show no reasonable expectation of privacy . . . , the question of invasion may be adjudicated as a matter of law." *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 40 (1994). Plaintiffs' claims collectively fail for four reasons, and Doe's fails for one more.

***First***, there is no reasonable expectation of privacy when browsing the web. To assume otherwise ignores the "inherent nature of the internet." *Thomas v. Papa Johns Int'l, Inc.*, 2024 WL 2060140, at *2 (S.D. Cal. May 8, 2024) (collecting cases). "Contemporary internet browsing involves the collection of users' data, including by tracking users across the internet, *and a reasonable user should expect as much*." *Hubbard v. Google LLC*, 2024 WL 3302066, at *7 (N.D. Cal. July 1, 2024) (emphasis in original). Indeed, it is essential to the function of websites.

***Second***, Plaintiffs attempt to manufacture an expectation of privacy for activities conducted on the internet, even though no expectation of privacy exists for the exact same activities conducted off the internet. Plaintiffs cannot reasonably expect privacy in activities like attending an open house (like searching for a home on Zillow), going to the movie theater (like watching a movie on Peacock), or buying a newspaper (like browsing Buzzfeed) or cookbook (like visiting Bon Appetit). "Shopping on a public website, like shopping in a public store, is not an activity one can reasonably

---

[5] To the extent Plaintiffs bring their claim under the California Constitution, the test is the same. *Hammerling v. Google, LLC*, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024).

expect to keep private from the retailer." *See Thomas*, 2024 WL 206014, at *2 (quoting *Farst v. Autozone, Inc.*, 700 F. Supp. 3d 222, 230 (M.D. Pa. 2023)). Even Doe's use of the Mindbloom website fails to state a claim. Doe admits that the only URL collected or disclosed was the domain name *mindbloom.com*, not individual pages on the website. (*See* Compl. ¶ 196; *id.* ¶ 256.) There is no reasonable expectation of privacy in searching for general medical information, just as there is no reasonable expectation of privacy in the general fact of medical treatment. *See Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (disclosure of searches and browsing history of "publicly available health information" did not reveal sensitive information). In short, shopping online instead of in-person "does not transform the generally public nature of shopping into a 'private affair.'" *Farst*, 700 F. Supp. 3d at 230.

***Third***, Plaintiffs have no reasonable expectation of privacy in the types of information that were allegedly disclosed here. Plaintiffs allege that PubMatic collects and discloses some combination of their "browser and device information," URLs, IP addresses, and a unique ID set by PubMatic to match activity to a user. (*See* Compl. ¶¶ 152–54, 158–59 (Zillow); *id.* ¶¶ 162–63, 165–66 (Peacock); *id.* ¶¶ 169–72, 180–81 (Buzzfeed); *id.* ¶¶ 186–87, 191–92 (Bon Appetit); *id.* ¶¶ 195, 198–99, 201, 203–04 (Mindbloom).)[6] But there is no reasonable expectation of privacy in "browser and device information," account IDs, or IP addresses, or even URLs. *See Low II*, 900 F. Supp. 2d at 1025 ("LinkedIn ID and the URL of the LinkedIn profile page that the user viewed" did not give rise to an invasion of a protected privacy interest); *see also Ji v. Naver Corp.*, 2022 WL 4624898, at *7 (N.D. Cal. Sep. 30, 2022) ("user and device identifiers" are not "the type of information that could give rise to a privacy injury").

***Fourth***, Plaintiffs have no reasonable expectation of privacy in anonymized data about their website-viewing habits. *See Saeedy*, 2023 WL 8828852, at *4 ("anonymized data" are not the "type of information" in which plaintiffs could have "a reasonable expectation of privacy"); *London v. New Albertson's, Inc.*, 2008 WL 4492642, at *8 (S.D. Cal. Sep. 30, 2008) ("no legally protected

[6] Plaintiffs allege only that PubMatic collects IP addresses from Buzzfeed, and not the other websites. (*Id.* ¶ 169.) Because Plaintiffs cannot base their claims on harms they did not allegedly suffer themselves, *see Spokeo*, 578 U.S. at 338 n.6, the allegations concerning IP addresses are relevant only to Semien, (*see* Compl. ¶ 209).

privacy interest" in "de-identified information [that] cannot be linked to individuals"); *see also Massie v. General Motors LLC*, 2022 WL 534468, at *5 (D. Del. Feb. 17, 2022) (plaintiffs had no reasonable expectation of privacy over anonymized data captured by Session Replay software). And, as set forth above, that is all they allege was collected or disclosed here. *See supra* at 8–10.

***Finally***, even assuming Mindbloom disclosed "sensitive" information about Doe and that information was somehow de-anonymized (neither of which is true), Doe expressly consented to the complained-of collection and disclosure practices on Mindbloom's website. Doe could not have a reasonable expectation of privacy when the applicable privacy policy "expressly disclosed" the website's intent to allow access to data. *See, e.g.*, *Hammerling*, 2024 WL 937247, at *3 (no reasonable expectation of privacy in data tracked by Google because the "Policy [ ] expressly disclosed Google's" tracking activities); *Smith v. Facebook*, 745 F. App'x at 8 (no invasion of privacy claim where plaintiffs consented to "Facebook's data tracking and collection practices").[7]

To make a purchase on *Mindbloom.com*, as Doe alleges she did (*see* Compl. ¶ 252), users must sign up for an account. (Lashway Decl., Ex. B.)[8] When they do so, they are presented with a screen notifying them that "[b]y clicking 'Start Now,'" users acknowledge they "have read, understood, and accepted" the hyperlinked Privacy Policy. (*Id.*) The Privacy Policy, in turn, notifies users that Mindbloom "work[s] with advertising networks that may track you . . . so that personalized advertisements or offers may be made for you." (Lashway Decl., Ex. A, at 4.) Those third parties "may use cookies, web beacons, device identifiers, and other technologies to collect information about your use of our Services and of other website and mobile apps." (*Id.*) And that information may include "your IP address, web browser, mobile network information, pages viewed, actions completed on the website and in our mobile app, time spent on pages or in mobile apps, links clicked, and conversion information." (*Id.*)

Because Mindbloom expressly disclosed that it and third parties -- including "advertising companies" like PubMatic -- might engage in the very activities of which Doe now complains, she

---

[7] PubMatic does not concede that the other Plaintiffs have not consented to the alleged data collection practices through the websites' privacy policies.

[8] Each of the exhibits to the Lashway Declaration are subject to judicial notice, as set forth in PubMatic's concurrently filed Request for Judicial Notice.

could not reasonably expect that they would not engage in those activities. *See, e.g.*, *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1055, 1058 (N.D. Cal. 2025) (no invasion of privacy claim where users checked a box that they agreed to the privacy policy, which disclosed the complained-of data-collection practices).[9]

**2. The collection of browsing data to craft targeted advertisements is not a highly intrusive invasion of privacy.**

Even if Plaintiffs have a reasonable expectation of privacy (they do not), their claim still fails because they have not adequately pled any highly offensive invasion of privacy. "Actionable invasions of privacy [*i.e.*, highly offensive invasions] must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Hill*, 7 Cal. 4th at 37. Even the "disclosure of personal information, including social security numbers," is not enough. *Low II*, 900 F. Supp. 2d at 1025.

Plaintiffs have not cleared that hurdle here. Courts repeatedly conclude that data collection and disclosure to third parties on the internet "is 'routine commercial behavior'" and "is not a 'highly offensive' intrusion of privacy." *Hubbard*, 2024 WL 3302066, at *7 (collecting cases); *Jones v. Peloton Interactive, Inc.*, 720 F. Supp. 3d 940, 951 (S.D. Cal. 2024) (collecting data about users' interest in "various fitness products and services" merely "routine commercial behavior"); *Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 992 (2011) (using plaintiff's address, obtained "without his knowledge or permission," "to mail him coupons and [ ] advertisements . . . . is . . . routine commercial behavior"). That is true even when the collection and sharing of the data are not obvious. *In re Google, Inc. Priv. Pol'y Litig.*, 58 F. Supp. 3d 968, 987–88 (N.D. Cal. 2014) (no egregious violation of norms when Google tracked users' browsing data surreptitiously).

Further, the collection and disclosure of the specific categories of information alleged here -- "browser and device information," URLs, IP addresses, and a unique ID set by PubMatic to match activity to a user -- all of which is anonymized, does not "constitute an egregious breach of

[9] Doe's consent to Mindbloom's data-collection practices also defeats each of her remaining claims. *See Lakes*, 777 F. Supp. 3d at 1055–58 (consent defeats ECPA claim and CIPA § 631(a) claim); *Libman v. Apple, Inc.*, 2024 WL 4314791, at *6 (N.D. Cal. Sept. 26, 2024) (consent defeats CIPA § 631(a) and unjust enrichment claims); Cal. Penal Code § 638.51(b)(5) (pen register may be used if "[t]he consent of the user . . . is obtained").

social norms." *See In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1050, 1063 (N.D. Cal. 2012) (disclosure of "unique device identifier number, personal data, and geolocation information" and "app-specific information such as which functions Plaintiff performed on the app," even without consent, "does not constitute an egregious breach of social norms"); *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *8 (N.D. Cal. Feb. 2, 2021) (disclosure of anonymized and aggregated "app activity data [ ] not tied to any personally identifiable information" not "egregious breach of social norms," even without consent); *Low II*, 900 F. Supp. 2d at 1025 (anonymized, but potentially de-anonymizable, data "including a numeric code associated with a user and the URL of the profile page viewed," not sufficient for a serious invasion of privacy).

### B. Plaintiffs fail to plead any wiretapping under CIPA § 631(a) or the ECPA (Counts II and V).

Under Section 631(a) of CIPA, liability may attach when a defendant, or someone whom defendant aided and abetted: (1) "intentionally taps . . . any . . . telephone wire"; (2) "willfully . . . attempts . . . to learn the contents or meaning of" a "communication . . . in transit . . . over any wire"; or (3) "attempts to use or communicate information obtained as a result of engaging in either of the two previous activities." Cal. Penal Code § 631(a). To prove a claim under any of these theories of liability, plaintiffs must allege that someone engaged in activity related to "contents" of "communication[s] in transit" "without the consent of all parties to the communication." *See id.*

As relevant here, the ECPA prohibits any person from "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication," as well as from "intentionally us[ing], or endeavor[ing] to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of" § 2511(1)(a). *See* 18 U.S.C. §§ 2511(1)(a), (d).

Plaintiffs' claims fail in several ways under both statutes.

#### 1. Plaintiffs' conclusory allegations do not adequately allege any interception "in transit."

To plead a claim under CIPA Section 631(a) and the ECPA (formerly the Wiretap Act), Plaintiffs must plead facts showing that PubMatic "intercepted" a communication while it was "in

transit." *See* Cal. Penal Code § 631(a) ("reads . . . communication while . . . in transit"); 18 U.S.C. § 2511(a), (c), (d) ("intercept[ion]" of a communication). "Intercept[ion]" must occur while the communication is being actively transmitted -- not before or after. Once the communication reaches its recipient and is then held in electronic storage, it is no longer in transit, and a party is not liable under either statute. *See* Cal. Penal Code § 631(a); *Adler v. Community.com, Inc.*, 2021 WL 4805435, at *3 (C.D. Cal. Aug. 2, 2021) (communication must be "acquired during transmission").[10]

Plaintiffs' use of buzzwords like "real time" and "immediate" interception, (Compl. ¶¶ 1, 170, 172, 187, 233, 245), is insufficient without specific facts alleging how PubMatic intercepted communications in transit, which Plaintiffs do not plead, *see Rodriguez v. Google LLC*, 2022 WL 214552, at *2 (N.D. Cal. Jan. 25, 2022) ("[u]sing the word 'intercept' repeatedly" not enough without additional specific facts "to make it plausible Google is intercepting their data in transit"); *Rosenow v. Facebook, Inc.*, 2020 WL 1984062, at *7 (S.D. Cal. Apr. 27, 2020) (pleading that "Yahoo knowingly used an algorithm to intercept and scan Plaintiff's incoming chat messages for content during transit and before placing them in electronic storage" was conclusory).

What's more, Plaintiffs' non-conclusory allegations reveal that any collection of Plaintiffs' interactions with websites occurs *after* the fact. According to Plaintiffs, users "communicate" with the host websites by requesting certain URLs from the websites. (*See* Compl. ¶ 59 (alleging the "communications" at issue are users' "selection of an article or video"); *id.* ¶ 60 (alleging that the "primary way" PubMatic intercepts communications is through "the collection of the universal resource locator ('URL') for each page of each website visited"); *id.* ¶ 62 (each page on a website has its own URL, "allowing pixels with access to the URL to see which pages of a website a particular Internet user ***visited***" (emphasis added)).) When users enter that URL, the browser sends a GET request to the website, which then responds by sending the website's content back to the user's browser. *See In re Zynga Priv. Litig.*, 750 F.3d 1098, 1101–02 (9th Cir. 2014). And by Plaintiffs' own account, it is *after* the website loads -- *i.e.*, once the "individual reach***ed***" the website (*see* Compl. ¶ 152) -- that the PubMatic Tracker loads and begins collecting information. Plaintiffs

[10] Courts employ the same standard under both CIPA § 631(a) and the ECPA. *See id.*

do not allege that PubMatic captures a user's individual keystrokes as they are entered into a browser. Any alleged interception thus occurred after the alleged communication -- the user's request and the website's response -- was complete.

PubMatic's activity here is thus similar to collecting information about emails after they are already received, which courts have held is not an interception "in transit" under the ECPA's parallel definition of "intercept." *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938, 952 (N.D. Cal. 2014) ("reading emails that have already been received in an email account's inbox does not constitute interception" (cleaned up)). As courts have explained, because of the speed at which computers operate, the reality may be that "[t]here is only a narrow window during which an E-mail" (or other data) "interception may occur -- the seconds or mili-seconds before which a newly composed message is saved to any temporary location following a send command." *Id.* at 951–52 (citation omitted). But that does not mean that it is the courts' job to adapt clear statutory language to morph interception into the collection of already-completed communications -- even if technology means that "interception . . . within the prohibition of the Wiretap Act is virtually impossible." *Id.* (citation omitted); *see also Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 114 (3d Cir. 2003) ("While Congress's definition of 'intercept' does not appear to fit with its intent to extend protection to electronic communications, it is for Congress to cover the bases untouched.").

**2. Plaintiffs do not plead that PubMatic intercepted a "communication."**

Plaintiffs' Section 631(a) and ECPA claims also fail because they do not adequately allege that PubMatic "intercepted" the contents of their communications, *i.e.*, "the intended message conveyed by the communication." *Zynga*, 750 F.3d at 1106.[11] "Record information regarding the characteristics of the message that is generated in the course of the communication" is not "content." *Id.* Record information includes "the name, address and subscriber number or identity of a subscriber or customer." *Graham*, 533 F. Supp. 3d at 833. Similarly, a URL that includes "basic identification and address information" is not "content." *Zynga*, 750 F.3d at 1108–09. Instead, the URL must divulge "specific information" allowing someone to understand the "search

[11] As with the "in transit" element, "content" has the same meaning under CIPA § 631(a) and the ECPA. *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 833 (N.D. Cal. 2021).

terms the user had communicated." *Id.* at 1108. That analysis is "case-specific," hinging on "'how much information would be revealed' by the information's tracking and disclosure," which requires the plaintiffs to plead specific facts supporting their conclusion that the contents of their communications were collected. *See King v. Hard Rock Cafe Int'l (USA), Inc.*, 2025 WL 1635419, at *3 (E.D. Cal. June 9, 2025). Plaintiffs' allegations do not meet that standard for two reasons.

***First***, to the extent Plaintiffs' claims are premised on PubMatic's collection of Plaintiffs' interactions with websites -- for example, user IDs, IP addresses, mobile IDs, and other information about users' browsers, devices, or geolocation (*see* Compl. ¶¶ 69–111, 126) -- that is mere record information and not content. *See Yale v. Clicktale, Inc.*, 2021 WL 1428400, at *1, *3 (N.D. Cal. Apr. 15, 2021) ("Plaintiff's keystrokes and mouse clicks on the [w]ebsite," "date and time of the visit, the duration of the visit, Plaintiff's IP address, her location at the time of the visit, her browser type, and the operating system on her device" were mere record information). Plaintiffs' claims should be dismissed to the extent they are predicated on that information being "content."

***Second***, all but one Plaintiff fails to allege interception of any actual "content" from the URLs. The closest Plaintiffs come to pleading "contents" is their allegation that PubMatic or the "Partner Pixels" collect URL data from the websites users visit. But, with the possible exception of Selby, Plaintiffs fail to plead sufficient facts plausibly amounting to "content."[12]

***Buzzfeed and Bon Appetit.*** Semien's and Mitchell's allegations fail for the fundamental reason that they do not allege that PubMatic intercepted any URLs *they* communicated that would reveal the content of the webpages they visited. Instead, they allege only that they visited Buzzfeed and Bon Appetit, respectively, without offering any factual detail about the specific communications intercepted. (*See* Compl. ¶ 244 (alleging interception of unspecified "full-string URL of each page" Mitchell visited); *id.* ¶¶ 209–18 (ECF p. 52) (alleging nothing about what types of URLs PubMatic collected from Semien's interactions with Buzzfeed).) And although they allege that at least some full-string URLs from these websites might reveal the contents of what is displayed on the webpage, (*see* Compl. ¶¶ 172, 187), they do not allege that *every* page has a URL

[12] Selby's CIPA Section 631(a) claim still fails because he has not adequately alleged any interception "in transit," *see supra* at 16–18, has not alleged any aiding-and-abetting liability, *see infra* at 20–21, and because he lacks standing to pursue all his claims, *see supra* at 6–10.

detailed enough to reveal the webpage's content. Indeed, the URL for the home pages for each of these websites -- simply *buzzfeed.com* and *bonappetit.com* -- reveal nothing about the content that appears on those webpages. It is not enough merely to allege an interception of generalized "full-string URLs." *See King*, 2025 WL 1635419, at *4 (allegations of interception of "full-string URLs" insufficient absent allegations about how the full-string URLs that *plaintiff* visited reflected her communications with the website). Plaintiffs' barebones allegations leave no ability to distinguish between "basic identification and address information," which is not content, and something else. *See Zynga*, 750 F.3d at 1108–09.

***Mindbloom and Peacock.*** Doe's and Gaw's allegations about Mindbloom and Peacock are even thinner. For Mindbloom, Plaintiffs allege only that another pixel collects the "URL of the Mindbloom website," which appears to be just the domain name (*mindbloom.com*) and not any specific webpage on that domain. (*See* Compl. ¶¶ 195–96.) If a URL that provides a link to the specific webpage on Facebook a user was browsing was insufficient, *see Zynga*, 750 F.3d at 1108–09, then the mere fact that Plaintiff visited *mindbloom.com* is not content either, *see id.* at 1108 (analogizing URLs to phone numbers and mailing addresses, which are not contents of telephonic or mailed communications). For Peacock, Plaintiffs do not even allege that the PubMatic Tracker tracks the domain URL (*peacock.com*) and thus do not plead the interception of anything even close to their own definition of a "communication." (*See* Compl. ¶¶ 163–66, 219–28 (alleging nothing about the URLs intercepted by Peacock, and alleging only vaguely that the PubMatic Tracker collected unspecified information about the "webpages [Gaw] visited").)

### 3. Plaintiffs fail to plead adequately aiding-and-abetting liability under CIPA.

Plaintiffs claim that PubMatic aids the Partner Pixels to which PubMatic provides identity resolution services in the Partner Pixels' alleged wiretapping. (Compl. ¶¶ 121, 296.) But Plaintiffs' allegations do not support their conclusory claim. For starters, Plaintiffs do not allege how those Partner Pixels themselves violate CIPA by intercepting communications in transit, as they must, to support a claim of aiding-and-abetting liability -- they simply state it is so. (*Id.* ¶ 123 ("Each Partner Pixel would itself intercept users' communications with the website or app.") *See B.K. v. Desert

*Care Network*, 2024 WL 5338587, at *3 (C.D. Cal. Aug. 22, 2024) (dismissing aiding-and-abetting claim because plaintiffs failed to "adequately allege an underlying predicate violation by" a third party). For another, Plaintiffs do not allege how PubMatic's identity resolution services, even if they operate as alleged, in any way aid the Partners Pixels' interception of communications "in transit." Instead, by Plaintiffs' own admissions, the identity resolution services work by aiding various pixels to translate the alphanumerical ID numbers each pixel assigns to a user or device into their own ID number -- but only ***after*** the first tracking pixel has already allegedly intercepted the communication. (Compl. ¶ 123 (alleging that after the Partner Pixels' alleged interception, the "PubMatic Tracker would ***then*** assign a PubMatic ID to the user's activity on the website or app"); *see also id.* ¶ 199 (alleging that the Partner Pixels call other trackers onto the website, and then -- "[m]illiseconds ***after*** receiving the information collected by" another pixel -- engages in cookie syncing and identity resolution trading).) By Plaintiffs' own allegations, PubMatic does not aid and abet an interception of communications, it only (allegedly) receives a benefit from and provides a service to the Partner Pixels after the fact.

**4. The website operators' consent also defeats Plaintiffs' ECPA claim.**

Finally, Plaintiffs' ECPA claim also fails because no ECPA claim lies where "one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act . . . ." 18 U.S.C. § 2511(2)(d); *see Lakes*, 777 F. Supp. 3d at 1057. Here, the website owners consented to any alleged interception by PubMatic. Plaintiffs concede that PubMatic "us[es] the Pixels ***in conjunction with*** website operators." (Compl. ¶¶ 45–46.) And they acknowledge that it is the website operators and app developers -- not PubMatic -- that install PubMatic's code in their websites or apps and "open up their applications' [or websites'] data" to PubMatic and other pixels. (*See id.* ¶¶ 92–95 (discussing PubMatic's SDKs and APIs, which "enable companies to open up their applications' or websites' data and functionality to external third-party developers, business partners" (cleaned up)).) Because one party to the communications consented to PubMatic's alleged interception, it cannot be unlawful. *See, e.g.*, *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 842 (N.D. Cal. 2024) (dismissing ECPA claim because "alleged interception of private health

information only occurs because the health care providers choose to install Google source code on their web properties").

The ECPA provides a limited exception to its one-party consent rule when the "communication is intercepted for the purpose of committing any criminal or tortious act. . . ." 18 U.S.C. § 2511(2)(d). Plaintiffs attempt to invoke this exception by asserting that the alleged interceptions here violated state laws including CIPA. (Compl. ¶ 340.) But to rely on the crime-tort exception, Plaintiffs cannot simply allege that the interception itself was illegal or tortious. *See Lakes*, 777 F. Supp. 3d at 1057. "[T]he focus [of the exception] is not upon whether the interception itself violated another law; it is upon whether the purpose for the interception -- its intended use -- was criminal or tortious." *Sussman v. ABC*, 186 F.3d 1200, 1202 (9th Cir. 1999). Plaintiffs must allege that the "primary motivation or a determining factor in the [defendant's] actions has been to injure plaintiffs tortiously." *Lakes*, 777 F. Supp. 3d at 1057. For example, wiretapping for purposes of blackmail fits within the exception; the mere act of wiretapping, though it may violate other state laws, does not. *See Sussman*, 186 F.3d at 1202–03. That rule makes sense: If the fact of interception alone is enough to invoke the crime-tort exception, then the exception would swallow the rule, because nearly every interception could be unlawful under other laws.

Plaintiffs do not allege any criminal or tortious motive here. Rather, they allege that PubMatic, website operators, and app developers collect user data to "enrich" themselves. (Compl. ¶¶ 31, 44, 118, 158, 180, 191, 203.) Courts repeatedly reject the application of the crime-tort exception where a defendant's alleged interception of communications is to facilitate routine commercial behavior; an intent to profit alone is not enough. *See, e.g.*, *Lakes*, 777 F. Supp. 3d at 1057–58 (alleged motive "to improve the effectiveness of its and Meta's advertising and marketing and to monetize the information via targeted advertising, and other means" insufficient to invoke crime-tort exception (cleaned up)); *Roe v. Amgen Inc.*, 2024 WL 2873482, at *6 (C.D. Cal. June 5, 2024) (exception did not apply where the interceptor's purpose was "to improve their marketing and advertising efforts" "rather than to injure plaintiffs tortiously or criminally"). And Plaintiffs here do not allege that PubMatic, or website or app developers, intended to injure Plaintiffs or commit any further crimes. *See Sussman*, 186 F.3d at 1202–03.

**C. Plaintiffs' claim under CIPA § 638.51 (Count III) fails because the PubMatic Tracker is not a "pen register."**

Plaintiffs' unsupported assertion that PubMatic operates a "pen register," (*see* Compl. ¶¶ 308–09 ("the PubMatic Tracker . . . is a pen register")), in violation of Section 638.51 defies common sense and indicates a fundamental misunderstanding of the statutory language.

To start, a "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." Cal. Penal Code § 638.50(b). A pen register thus collects ***outgoing*** information from a device. *See id.*; *compare id.* § 638.50(a) (defining a "trap and trace device" as the same, but for "incoming" signals). Yet Plaintiffs allege that the PubMatic Tracker "collects information from users' browsers and devices when they visit the websites of PubMatic's publisher clients' websites." (Compl. ¶ 48; *see id.* ¶ 60 (describing the tracker as "loaded on to a website").) By Plaintiffs' own account, then, the PubMatic tracker collects *incoming* information from users when they access third-party websites, not the other way around. Plaintiffs' allegation that PubMatic operates a "pen register" thus fails.

Further, the language, context, and legislative history of Section 638.51 confirm that it is intended to apply to telephones, not web-tracking technologies. Section 638.51 prohibits the use of any pen register or trap and trace device "without first obtaining a court order pursuant to Section 638.52." Cal. Penal Code § 638.51(a). But any such order must "specify" "the person . . . in whose name is listed ***the telephone line***" and "[t]he number and, if known, physical location of ***the telephone line*** to which the pen register or trap and trace device is to be attached." *Id.* § 638.52(d)(1), (3) (emphases added). Under Plaintiffs' theory, Section 638.51 would permit pen registers or trap and trace devices collecting IP addresses. But those could never be legal because the court order authorizing them would not meet the statutory requirements. That result is illogical and conflicts with the legislative history, which makes clear that the Legislature was not concerned with internet-based tracing when it enacted Section 638.51. *See People v. Mitchell*, 46 Cal. App. 5th 919, 928 (2020) (statutes are construed "in a way that most closely comports with the apparent intent of the Legislature"). Instead, the legislative history is replete with references to telephonic

pen registers and trap and trace devices.[13] The statutory scheme and intent thus make clear that Section 638.51 applies only to telephonic devices. *Aviles v. Liveramp, Inc.*, 2025 WL 487196, at *2 (L.A. Cty. Super. Jan. 28, 2025). Were there any doubt, the benefit of that doubt goes to PubMatic under the rule of lenity. *Sanchez v. Cars.com*, 2025 WL 487194, at *3 (L.A. Cty. Super. Jan. 27, 2025).

Beyond that, Plaintiffs' reading of the statute would open every single website to liability under Section 638.51. If recording outgoing "dialing, routing, addressing, or signaling information" from a user's computer is a pen register, then recording "incoming" information of the same sort necessarily is a "trap and trace device." *See* Cal. Penal Code §§ 638.50(b)–(c). But recording incoming IP addresses and related information about users accessing a website is just "how the internet normally works." *Aviles*, 2025 WL 487196, at *2 (dismissing pen register claim against ad tracker). By Plaintiffs' own account, "an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another" and is "***essential*** for . . . facilitating smooth communication between devices." (Compl. ¶ 80.) Indeed, for that reason, the Superior Court noted in *Aviles* that even the Court's own website collects and records the IP addresses of visitors. *See* 2025 WL 487196, at *3. Yet under Plaintiffs' theory, any time a website collects that information, even if necessary to make the website work, it violates Section 638.51 and subjects itself to both civil and criminal penalties. Plaintiffs' illogical reading -- which would collapse the internet -- should be rejected. *See, e.g.*, *Mitchell*, 46 Cal. App. 5th at 929 (California courts "avoid interpreting statutes in a manner that may produce illogical results").

Reading Section 638.51 to make adtrackers (which Plaintiffs allege the PubMatic Tracker is) pen registers or trap and trace devices would also create conflict between the California Penal Code and the CCPA. The CCPA, which Plaintiffs do not allege PubMatic violated, is a comprehensive privacy statute that details the requirements for the collection, retention, and sale of

[13] (*See, e.g.*, Lashway Decl., Ex. E, AB 929, Assembly Committee on Privacy & Consumer Protection, at 4 ("This bill is intended to authorize . . . emergency orders for pen registers/trap and trace devices used in ***telephonic surveillance*** . . . ."); *id.* at 5 ("pen registers/trap and trace devices are used by law enforcement ***for telephone surveillance***"); Lashway Decl., Ex. F, AB 929, Senate Committee on Public Safety, at 10 (describing "a 'pen register' which allows law enforcement officers to record all outgoing numbers from a particular ***telephone line***" and a 'trap and trace device' which allows them to record what numbers have called a specific ***telephone line***").)

personal information, including in third-party advertising. *See* Cal. Civ. Code §§ 1798.100 *et seq.* Far from criminalizing adtrackers and data brokers, Plaintiffs admit that the CCPA specifically contemplates this activity and requires data brokers to register and be subject to regulatory oversight. (*See* Compl. ¶¶ 14–15.) Cal. Civ. Code §§ 1798.99.82, 1798.99.87. To adopt Plaintiffs' proposed reading of the pen-register provisions of CIPA would thus criminalize activity specifically authorized by the CCPA.[14] But courts "harmonize statutes," not read them to create conflicts. *See In re Jenson*, 24 Cal. App. 5th 266, 275 (2018).

### D. Plaintiffs' duplicative unjust enrichment claim (Count IV) should be dismissed.

Plaintiffs' claim for unjust enrichment also fails for two reasons.[15]

***First***, under California law, "[a] cause of action titled 'unjust enrichment' . . . can be construed as a claim that the plaintiff is entitled to restitution under the theory 'the defendant obtained a benefit from the plaintiff by fraud.'" *See Silver v. Stripe Inc.*, 2021 WL 3191752, at *8 (N.D. Cal. July 28, 2021). But Plaintiffs do not allege how PubMatic defrauded them (which allegations also must be pled with particularity, *see Sepehry-Fard v. MB Fin. Servs.*, 2015 WL 903364, at *3 (N.D. Cal. Mar. 2, 2015)). They only allege in conclusory fashion that PubMatic retained a benefit without their consent. (*See* Compl. ¶¶ 316–19.) That is not enough.

***Second***, this claim is mutually exclusive of Plaintiffs' other claims because a plaintiff asserting an unjust enrichment claim must "choose[] not to sue in tort, but instead to seek restitution on a quasi-contract theory (an election referred to at common law as waiving the tort and suing in assumpsit)." *Silver*, 2021 WL 3191752, at *8. Because Plaintiffs assert tort claims, they have forfeited their right to recover on a quasi-contract theory. *See id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed with prejudice.

[14] California law adopts an opt-out -- not an opt-in, or consent-only -- framework, where consumers must affirmatively opt out from data collection and disclosure, Cal. Civ. Code §§ 1798.120, 1798.135, which would conflict with the consent requirement under CIPA.

[15] Again, Plaintiffs bring this claim under California law. (Compl. ¶ 315.)

Dated: August 15, 2025

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.

By: */s/ Scott T. Lashway*
Scott T. Lashway
(admitted *pro hac vice*)
Marc H. Axelbaum
Mara A. O'Malley
(admitted *pro hac vice*)
Mitchell J. Clough
(admitted *pro hac vice*)

*Attorneys for Defendant PubMatic, Inc.*